**In re WABASH VALLEY POWER ASSOCIATION, INC., Debtor.**

**Bankruptcy No. IP85–2238RA S.**

United States Bankruptcy Court,
S.D. Indiana,
Indianapolis Division.

Sept. 21, 1987.

David Kleiman, Indianapolis, Ind. (Dann, Pecar, Newman, Talesnick & Kleiman) for the debtor.

George Kielman of the U.S. Dept. of Justice, Washington, D.C., for the REA.

Wilbur Foster, New York City (Milbank, Tweed), for CFC.

## ENTRY ON AMENDED APPLICATION FOR VALUATION

NICHOLAS W. SUFANA, Bankruptcy Judge.

### Part One

*I. Introduction: Procedural History*

Wabash Valley Power Association, Inc. ("Wabash"), filed its first plan of reorganization on September 10, 1985, and its first Application for Valuation on November 5, 1985.

The first application requested this Court to determine the extent of the secured claims of the creditors holding liens against Wabash's assets as provided in 11 U.S.C. § 506(a), determine the value of Wabash as a going concern for the purpose of 11 U.S.C. § 1129(b), decide the liquidation value of Wabash so that the Court could later determine whether the plan proposed by Wabash satisfies the requirements of 11 U.S.C. § 1129(a)(7)(A)(ii), and to establish the value of the assets securing the indebtedness of any secured creditor electing treatment pursuant to 11 U.S.C. § 1111(b). The application listed most of the assets of Wabash, and requested a determination of value as to each of them.

The Court conducted a pre-trial conference on the application. On January 9, 1986, the Court issued a notice which established discovery deadlines, set the application for hearing during six weeks in July, August, September and October of 1986, and required any entity intending to present evidence on valuation to file a notice of that intent by February 1, 1986. The Indiana Municipal Power Agency ("IMPA"), Northern Indiana Public Service Company ("NIPSCO"), the Official Members' Committee, the United States on behalf of its Department of Agriculture, Rural Electrification Administration ("REA"), the National Rural Utilities Cooperative Finance Corporation ("CFC"), and the State of Michigan and the Michigan Public Service Commission all filed notices of their intent to present evidence at the hearings.

On April 8, 1986, Wabash filed its First Amended Plan of Reorganization. On April 9, 1986, Wabash filed its Amended

Application for Valuation. That application requested valuation for all the purposes listed in the first application, but excluded from the list of assets to be valued certain litigation arising from Wabash's involvement in the Marble Hill nuclear power plant.

REA requested an extension of the discovery deadline and a continuance of the valuation hearings on April 21, 1986. The Court extended the discovery deadline to December 1, 1986, and rescheduled the valuation hearings for six weeks in February, March, April, and May of 1987.

Wabash and REA later extended the discovery deadline by stipulation, continued the scheduled starting date of the valuation hearings to February 23, 1987, and agreed that the valuation hearings would not address the liquidation value of Wabash, but would be limited to the going concern value. The other entities which had expressed an interest in presenting evidence apparently acquiesced in this agreement.

On February 11, 1987, REA filed a motion to continue the start of the valuation hearings to March 16, 1987. The Court granted that motion. On March 3, 1987, Wabash filed another Amended Application for Valuation. That application requested that the Court determine only the "going concern" value of Wabash for the purposes of 11 U.S.C. § 506, 11 U.S.C. § 1111(b), and 11 U.S.C. § 1129.

The hearings on the amended application for valuation occurred from March 16th through March 20th, April 6th through April 10th, April 27th through May 1st, and May 18th through May 21st, 1987. Only REA and Wabash presented evidence. The transcript of the testimony presented fills 19 volumes. The parties submitted over 150 exhibits. The post-hearing briefs consume almost 200 pages. Out of this morass, the Court must extract one number: the going concern value of Wabash.

This entry constitutes the Court's findings as required by Bankruptcy Rules 9014 and 7052. This entry begins with a review of the parties involved. Next, the Court recounts the history of Wabash, the relationship between Wabash and the other parties as it developed over the years, and the evolution of Wabash's rate structure. A discussion of the market which Wabash faces at the present, and the various elements that impinge upon the going concern value, follows.

After exploring the models and forecasts upon which the various valuation reports are based and the valuation methods employed by the different experts, the Court reviews the specific evidence of Wabash's going concern value, and selects that valuation which the Court believes most accurately captures the "going concern" value of Wabash.

## II. The Entities Involved and Wabash's Rates

Wabash is a not-for-profit generation and transmission ("G & T") electric cooperative, formed on December 12, 1963, under the Indiana Not-For-Profit Corporations Act, Indiana Code ("I.C.") §§ 23–7–1–1 *et seq.* (Since repealed: now I.C. §§ 23–7–1.1–1 *et seq.*) Wabash is governed by a board of directors, comprised of one director from each of the 24 member systems. Each system also selects a non-voting representative, who advises the Wabash board. Through its members, Wabash serves approximately 175,000 retail customers in northern Indiana and southwestern Michigan. Wabash estimates that it supplies the electricity to 400,000 people.

The board of directors for Wabash selects the general manager, and that general manager in turn hires all the other employees. The board of directors must also approve all rate requests.

Each of the 24 members of Wabash is a distribution electric cooperative, and like Wabash is not operated for profit. In Indiana, each cooperative is a rural electric membership cooperative ("REMC"), formed pursuant to the Indiana Rural Electric Membership Corporation Act, I.C. §§ 8–1–13–1 *et seq.* Fruit Belt is an electric cooperative, formed pursuant to the pertinent laws of Michigan. Paulding-Putnam Electric Cooperative was formed pursuant to the laws of Ohio. For the purposes of this

entry, all of Wabash's members shall be referred to as "the REMCs." Each REMC is governed by a board of directors, which hires a cooperative manager. The customers of each local REMC are its members.

To remain a member of an REMC, that member must purchase electricity supplied by the REMC. I.C. § 8–1–13–9. In addition to this protection of its customer base, each REMC has been assigned an exclusive geographical area. See I.C. §§ 8–1–2.3–1 *et seq.* These exclusive areas only became effective after January 1, 1979. Prior to that time, the REMCs developed in some areas which were already served by IOUs or by municipal utilities. As a result, a customer served by an REMC might be adjacent to or across the street from a customer served by one of the investor-owned utilities ("IOUs") or by a municipal utility. Transcript, Vol. II, pp. 55–56. (In order to save space, all other references in this entry to the Transcript from the valuation hearing give only the Roman numeral of the volume and the specific page number.) Wabash's monopoly is therefore legislative and not natural. Under state law, the monopoly exists only as long as an electricity supplier continues to provide "adequate" retail service. I.C. § 8–1–2.3–4(a). The term "adequate" is not defined in the statutes which establish the exclusive geographical areas.

REA was created by the Rural Electrification Act, 7 U.S.C. §§ 901 *et seq.*, passed in 1936. REA now conducts three types of loan programs: a direct loan program, an insured loan program, and a guaranteed loan program. Under the guaranteed loan program, REA guarantees loans made by the Federal Financing Bank ("FFB"). Such loans charge interest at a rate one-eighth above the cost to the FFB. Like the other loan programs, a borrower can use a guaranteed loan to finance 100% of the costs of construction.

Wabash has acquired most of its assets with REA financing. All of Wabash's loans with REA were obtained through the guaranteed loan program. REA exercises "pervasive" control over Wabash and its other borrowers. REA dictates the ac-

counting system used by Wabash, reserves a right of approval over all contracts, and specifies various construction standards. I, pp. 146–148, pp. 151–153. For those projects not funded by an REA loan, REA has given a lien accommodation to the other financing entity. I, pp. 154–155.

CFC is a not-for-profit cooperative association which provides its members, generally rural electric cooperatives, with funding to supplement REA's loan program.

The Federal Energy Regulatory Commission ("FERC") establishes the rates, terms and conditions for the sale of electric power interstate, has jurisdiction over interchange arrangements among IOUs, and has jurisdiction over rates charged by an IOU to a cooperative. I, pp. 29–30.

The Indiana Public Service Commission, recently renamed the Utility Regulatory Commission, governs rates charged by Wabash to its Indiana members and by the Indiana REMCs to their customers. The rates Wabash charges to Fruit Belt Electric Cooperative ("Fruit Belt"), both for service to that portion of Fruit Belt which lies in Michigan and that portion which lies in Indiana, are governed by the Michigan Public Service Commission. Wabash only serves the Indiana portion of Paulding-Putnam, and those rates are controlled by the Indiana PSC. I, pp. 51–52, p. 165. References to "the PSC" herein denote only the former Indiana Public Service Commission, unless otherwise specifically stated.

The PSC, under the authority granted it by the Public Service Commission Act of 1941, I.C. §§ 8–1–1–1 *et seq.*, has established procedures for the consideration of any petition for a change in rates. The PSC receives input from the Utility Consumer Counselor, who may appear at any hearing, or participate in any appeal, on behalf of ratepayers, consumers, and the public.

The history of Wabash is detailed below, but a short discussion of the rates which Wabash has charged to its members over the years is appropriate here.

Before Wabash began supplying its members with electricity, members received their electricity directly from one of

four IOUs: NIPSCO, Indianapolis Power & Light Company ("IPL"), Public Service Company of Indiana ("PSI"), and Indiana & Michigan Electric Company ("I & M"). Each member generally bought power from the IOU located closest to it.

When Wabash began supplying its members with electricity, it purchased most of its power from the same four IOUs identified above. At first, Wabash charged what has been termed a "melded" rate for each kiloWatt-hour (kWh). That melded rate was the average of all the rates which Wabash paid its suppliers. Broken down into percentages, 50% of the power purchased came from PSI, 25% from NIPSCO, 25% from I & M, and less than 1% was from IPL. I, pp. 86–87, 94.

At some point, NIPSCO's rates began to increase dramatically. Since NIPSCO's rates determined 25% of Wabash's melded rate, the Wabash rate began to rise. The increase generated unrest among customers outside the NIPSCO area, and particularly in the I & M area, where customers discovered that they were paying more than individuals who purchased directly from I & M. I, pp. 94–95.

As a result of customer pressure, the Wabash board requested a change in Wabash's rate structure, so that rates to each REMC would be more attributable to the rates of the IOU which formerly served that REMC. The PSC initially rejected the request, but when Wabash renewed the request, the PSC decided to allow Wabash to use a "50/50" rate structure. Under this structure, the rate for each REMC is determined first by determining 50% of the melded rate, and then by adding to that figure one-half of the rate charged to Wabash by the IOU which had formerly served the particular REMC. Under the 50/50 rate structure, the rates among Wabash's members vary considerably. II, pp. 139–140.

## III. History of Wabash

When first formed in 1963, Wabash had 21 members. Because the per unit cost of electricity was declining during most of the 1960's, Wabash acted more as a club than as a business, and served more "as a clearing point for new ideas than as a focal point for operations and development." I, pp. 47–49. The sole source of income for Wabash was the dues paid by its members.

When the per-unit cost of electricity began to climb in 1968, Wabash hired its first general manager. That individual attempted to obtain for Wabash an ownership interest in a coal-fired generating plant owned by NIPSCO. Such efforts were ultimately unsuccessful. Wabash hired its present general manager, Edward P. Martin ("Martin"), in 1976. Wabash's capitalization upon Martin's arrival was $100,000, derived from dues paid by the members. Wabash was still not supplying any of its 21 members with electricity.

Before Martin's arrival, the president of PSI had written to the manager of Wabash concerning the possibility of Wabash participating as an investor in the two-unit Marble Hill nuclear power plant ("Marble Hill"). After Martin's arrival, extensive negotiations concerning Marble Hill were conducted. Originally, Wabash was to own 7% of the plant, NIPSCO was to own 20%, East Kentucky Electric Cooperative, another G & T cooperative, was to own approximately 6%, and PSI was to own the remainder.

For various reasons, NIPSCO and East Kentucky Electric Cooperative dropped out of the project. Wabash assumed 10% of NIPSCO's proposed ownership interest, raising Wabash's interest to 17%, and PSI became the owner of the remaining 83% interest.

In 1977, apparently as a prerequisite to financing Wabash's interest in Marble Hill, REA required Wabash to enter into wholesale power supply contracts ("the Contracts") with each of its members. The Contracts provide that the members will buy all of their electricity from Wabash for a 40-year term. REA suggested that length of time, which was tied to the 35-year note and the five years planned for construction. I, p. 161. The Contracts provide that Wabash will charge a rate sufficient to allow all of Wabash's costs to be satisfied. I, p. 163.

Wabash and PSI signed a formal Nuclear Plant Purchase and Ownership Agreement on February 1, 1978. REA and Wabash entered a loan contract on February 13, 1978, whereby REA agreed to guarantee a loan not to exceed $360,684,000. Government Exhibit 10. On February 22, 1978, Wabash executed a promissory note in favor of FFB for $360,684,000. REA guaranteed the note. Government Exhibit 9.

Wabash intended the note to cover the entire cost of Wabash's 17% interest in Marble Hill. At the time the note and accompanying documents were issued, Wabash estimated that Marble Hill would be completed in 1982. I, pp. 174–175. Wabash executed a mortgage and security agreement to REA in late February of 1978. Government Exhibit 8. That mortgage and security agreement cover all of Wabash's property, including Wabash's interests in the Contracts with each of its members. The PSC had approved the loan agreement between Wabash and REA by an order dated January 13, 1978. Government Exhibit 80.

In April of 1978, Wabash entered into a pooling rate agency agreement with each of its members. That agreement was filed with and approved by the PSC. Apparently, with that agency agreement, the individual REMCs assigned their contracts with the four IOUs to Wabash.

IPL has never recognized the assignment of its contract with Boone County REMC to Wabash, and Boone County REMC remains the principal obligor on that contract. Similarly, I & M "assented" to the assignment of its contracts with Wabash members only after Wabash filed an action with FERC, and the assent has resulted in no change in the treatment of the members by I & M. I, pp. 99–101.

Work on Marble Hill continued during 1979 and 1980. Because Wabash was only a financial participant in Marble Hill, Wabash was not responsible for and did not supervise or otherwise control the construction.

On April 14, 1980, REA and Wabash supplemented the original mortgage and security agreement to add CFC as a secured party. Government Exhibit 11. The Supplemental Mortgage and Security Agreement was executed because CFC had guaranteed payment of $2,750,000 in City of Indianapolis, National Rural Economic Development Revenue Bonds. Wabash used the proceeds from those bonds to build its headquarters on the west side of Indianapolis.

While the work on Marble Hill continued, Wabash became even more tied to PSI through the execution of several other agreements. In September of 1981, Wabash executed a note to FFB, guaranteed by REA, for $673,000,000, Government Exhibit 14, and also executed a Supplement to the Supplemental Mortgage and Security Agreement, Government Exhibit 12. A portion of the funds was used to purchase an interest in 29 substations and 10 PSI transmission lines.

Wabash used another portion of the funds to implement its load management program. Under this program, Wabash controls electric water heaters and equivalent appliances from its headquarters. Such control enables Wabash to limit its peak demand by preventing the operation of water heaters and other appliances when demand created by the use of other equipment is high. Wabash used the remainder of the funds to pay for cost overruns on the Marble Hill construction.

Then, in August of 1982, Wabash purchased a 25% interest in the PSI coal-fired generating plant known as Gibson 5 ("Gibson 5"). To finance the purchase, Wabash executed a new note to FFB in December of 1982 in the face amount of $133,000,000, again guaranteed by REA. Government Exhibit 17. A handwritten notation on the document suggests that the effective amount of the note was reduced to $93,-000,000 by REA in April of 1983.

On December 1, 1982, Wabash executed a new secured promissory note to CFC in exchange for the latter's unconditional guarantee of $24,000,000 in Princeton, Indiana, National Rural Utilities Cooperative Finance Corporation Pollution Control Revenue Bonds issued to pay for pollution control devices at Gibson 5.

Even after adoption of the 50/50 rate discussed in the background section above, Wabash's rates continued to increase because of the continuing rise in NIPSCO's rates. Some time in the early 1980's, the Wabash board voted to seek another rate change and to obtain another source of power supply in the NIPSCO area. After various negotiations failed, Wabash filed an antitrust action against NIPSCO.

NIPSCO and Wabash settled the suit in October of 1983. Pursuant to the complicated arrangement, not made part of the record, Wabash was allowed to decrease its purchases from NIPSCO and to "wheel" power over NIPSCO's lines. A "wheeling" agreement allows a utility to buy electricity from a distant source, and to bring it over the transmission lines of a nearby utility after paying a fee, described as the equivalent of a toll on a toll road, to the utility whose lines are used. I, p. 104. Thereafter, Wabash began to supply its members in the NIPSCO area with power purchased from PSI, from Central Illinois Public Service Co. ("CIPS"), and from Hoosier Energy ("HE"), a G & T cooperative located primarily in Southern Indiana.

Marble Hill was not completed in 1982. The governor of Indiana appointed a task force in 1983, and that task force recommended that Marble Hill not be completed. The governor concurred in that recommendation in December of 1983. In early 1984, PSI informed Wabash that it was discontinuing construction. All construction ceased officially as of January 16, 1984. At that point, Wabash had borrowed and invested $486,000,000 in Marble Hill. All of Wabash's other debts totalled only $150,000,000. I, p. 180.

Wabash, PSI, Westinghouse, and Bechtel formed a task force to see if Marble Hill could be salvaged or transformed into a coal-fired generating plant. I, p. 181. These efforts were abandoned later in 1984.

Meanwhile, on April 6, 1984, at the insistence of REA, Wabash filed with the PSC a request for a rate increase of 51% so that Wabash could pay its Marble Hill debt ("the Rate Case"). The Rate Case proceeded before the PSC during the summer of 1984.

Wabash also applied to CFC for a $53,000,000.00 loan to pay off some of the interest and principal owed to REA on the Marble Hill debt. On July 2, 1984, Wabash entered a loan agreement with CFC whereby CFC was to loan $9,610,371.00 initially, and committed up to $53,000,000. The loan agreement was subject to PSC approval, and was apparently presented to the PSC immediately thereafter.

During July of 1984, at the specific request of REA, some of the boards of the member REMCs passed a resolution affirming the enforceability of the wholesale power supply contracts. REA Exhibit 34. The resolutions refer to the cancellation of Marble Hill, and state that the resolutions were passed to induce CFC to loan funds to Wabash. The resolutions also state that the board of directors for the member "has reviewed and approves the terms and conditions of the CFC loan and the plan of Wabash for the phase-in of debt service associated with Marble Hill." Government Exhibit 34. No resolution from the board of Kankakee Valley REMC, Jay County REMC, Fulton County REMC, Boone County REMC, Whitley County REMC, or Fruit Belt was ever introduced into evidence.

On September 28, 1984, the PSC issued an order regarding the proposed $53,000,000 borrowing. In that order, the PSC determined that "for regulatory purposes [Wabash's] legal status is that of a 'public utility' within the meaning of the Public Service Commission Act, I.C. 8-1-2-1 *et seq.*, although it effectively operates as a 'general district corporation' pursuant to the Rural Electric Membership Corporation Act, I.C. 8-1-13-1 *et seq.*" Wabash Exhibit 10, p. 2. The PSC went on to hold that Wabash would be required in all future rate proceedings to present an analysis of its rates and charges based "not only on the cash revenue requirement elements as identified at I.C. 8-1-13-17, but also [Wabash] must evaluate its rates and charges based upon the more traditional 'rate of return' revenue requirement approach applied generally by this [PSC] to other pub-

lic utilities." Wabash Exhibit 10, p. 2. CFC did loan Wabash $8,602,151.00, the amount approved by the PSC. VI, p. 104. CFC never loaned the remaining $53,000,-000 which it had committed. XIII, p. 139.

This ruling represented a change in the PSC's approach to Wabash's fee applications, since previously Wabash's applications had been analyzed only in terms of Wabash's revenue requirements. I, p. 168. The change further delayed the Rate Case, because of the need to gather and consider "rate of return" evidence.

Wabash defaulted on the first payments due on its Marble Hill debt on September 30, 1984. According to Martin, Wabash has never paid any of its Marble Hill debt, except for some interest paid with the loan from CFC. I, pp. 178–180.

On December 27, 1984, the Indiana Court of Appeals issued its decision in *Citizens Action Coalition et al. v. Northern Indiana Public Service Company, et al.,* 472 N.E.2d 938 (Ind.App.1984). That decision overturned an order of the PSC, and held that NIPSCO could not raise its rates to amortize the sunk costs of a cancelled nuclear power plant known as Bailly N–1.

Again at the request of REA, Wabash sought leave of the PSC to file an amended petition seeking emergency rate relief on January 31, 1985. The Utility Consumer Counselor moved to dismiss that petition based upon the Court of Appeals' *NIPSCO* decision. The PSC allowed Wabash to file a petition seeking emergency relief, but stayed any consideration of proceedings on Wabash's Marble Hill debt until final appellate action in the *NIPSCO* case.

Wabash never filed the amended petition, but on May 16, 1985, asked the PSC to stay further proceedings on the Rate Case. The PSC granted the motion on May 23, 1985, the same date that Wabash filed its Chapter 11 bankruptcy petition.

Wabash filed its bankruptcy petition after negotiations with REA—including a proposed three-year phase-in of higher rates—broke down, and after attorneys from the United States Department of Justice sent to Martin and all of the directors of Wabash a letter dated April 19, 1985, which cited 31 U.S.C. § 3713, and suggested that each recipient of the letter might be held personally liable for Wabash's debts. Wabash Exhibit 14. A "moratorium"—the exact nature of which is unclear—was granted by REA, but only until May 24, 1985. III, p. 23. Wabash filed bankruptcy the day before that moratorium expired.

On November 15, 1985, the Indiana Supreme Court issued its opinion in *Citizens Action Coalition v. NIPSCO,* 485 N.E.2d 610 (Ind.1985), *cert. denied,* — U.S. —, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986) ("the *NIPSCO* decision"). That opinion upheld the Court of Appeals, and concluded that the PSC lacked the statutory authority to permit NIPSCO to recover through rate increases the costs of Bailly N–1, because amortization of sunk costs was not an allowed operating expense.

The Utility Consumer Counselor moved to dismiss Wabash's Rate Case on April 25, 1986. That motion alleged in part that the Rate Case should be dismissed because the *NIPSCO* decision precludes Wabash from obtaining any increase in rates to service its Marble Hill debt. Several other entities, including some of Wabash's members, intervened in support of the Utility Consumer Counselor's motion. CFC and REA also intervened in the case, arguing that the *NIPSCO* decision did not apply to Wabash, but suggesting that the rate petition should be dismissed for lack of prosecution.

On January 14, 1987, the PSC issued an order dismissing Wabash's rate request. The PSC specifically concluded that "[T]he recovery of costs associated with the cancelled power plant is precluded regardless of [Wabash's] regulatory status. The principles upon which the *NIPSCO* case were decided by the Indiana Supreme Court are equally applicable to a utility whose rates are made pursuant to I.C. 8–1–13–1 *et seq.*" Wabash Exhibit 10, p. 9. The "cost associated with utility plant not used and useful cannot be recovered through rates." Wabash Exhibit 10, p. 10. CFC and REA have appealed this decision of the PSC, but Wabash has not.

## IV. The Present

Wabash has grown since 1976 from an entity with few employees and no headquarters building to an entity with a large headquarters building, an ownership interest in part of Gibson 5, an ownership interest in certain PSI transmission lines and substations, and 80 employees. However, in the past few years the rate of market growth for electricity suppliers has declined from an average annual increase of 7% per year to an average annual increase of 2% or less. I, p. 122. Martin testified that the rate of growth for Wabash has gone "flat." III, p. 36.

Because many of the utilities in the eastern United States, the so-called "Eastern grid," constructed power plants based upon the 7% annual growth rate, many electric utilities now have excess capacity. The "tremendous surplus of generating capacity in the midwestern United States" has created a market for short-term supplies of electricity that is quite competitive. I, p. 120. While obtaining electricity from a distant supplier requires complex contractual arrangements, such deals are not unknown. For example, HE supplies electricity to Virginia Power & Electric Company. I, p. 114.

Wabash takes advantage of the competitiveness in the short-term supply market through its interchange and interconnection agreements with PSI, NIPSCO, CIPS, and Big Rivers Electric Cooperative in Kentucky. I, p. 116.

To insure adequate future supply, and to lock in at least a portion of the price of electricity for the future, Wabash has also negotiated long-term power supply contracts with CIPS and HE. I, p. 126. Such long-term contracts protect Wabash from sudden price increases. I, p. 135. The market for such long-term contracts appears to be less competitive, because some of the suppliers wish "to retain the generating capacity they now have to serve their existing and their own plant (sic— 'planned') load." IV, p. 95. Still, Wabash's prospective suppliers, particularly HE, are expected to have excess base load capacity "for a considerable period of time." IV, p. 93.

The ultimate consumers of the electricity which Wabash supplies are primarily residential. Non-residential accounts comprise only 5% of the market served by Wabash, and consume only 20% of the electricity.

The ultimate consumers—particularly the residential users—have certain alternatives to the use of electricity supplied by Wabash. A "large part" of Wabash's ultimate consumer base has natural gas service available to it. II, p. 99. The rest can switch to propane gas, if needed. II, p. 99. While gas is not used for lighting or to operate other electrical appliances, gas competes directly with electricity for the space heating and water heating market. Martin stated that Wabash is in "a life and death struggle with natural gas for the space heating market." II, p. 14.

Because 50% of the electricity which Wabash sells is used for space heating, water heating, and air conditioning, a switch to natural or propane gas for space or water heating by a number of residential consumers would significantly affect the demand for Wabash's electricity. At present, 50% of those residential consumers who replace their electric heating unit switch to gas heat. XIII, pp. 45–46. Many consumers installed their electric heating appliances in the late 1960's and early 1970's, and many of those consumers will be replacing their electric heating units in the next five to ten years. XIII, p. 45. If the price of electricity increases relative to the price of gas, more consumers may switch from electric heat to the fossil fuels. XIII, p. 46.

The alliance of REMCs which created Wabash has always been fragile. In the past, member REMCs have opposed rate increases which have been supported by a majority of Wabash's board of directors, and have appeared before the PSC to express their opposition. I, p. 172. Some members are disgruntled with the present 50/50 rate structure. Because of the new suppliers which Wabash has obtained for the NIPSCO area, the costs to Wabash for servicing members in that area have declined, but rates have not. Several mem-

ber systems in that area are now seeking a decrease in rates to reflect the lower cost of electricity. Other members are opposed to the decrease in rates—or do not feel that a decrease in the NIPSCO area is justified. The dispute has divided the members into several "camps," as Martin described them, and the camps are hiring lawyers and consultants to determine ways to remedy the perceived inequities in the present rate structure. I, p. 171.

(The information contained in the preceding sections was gleaned from three sources: the transcript of the hearings on the amended application for valuation, the exhibits introduced at those hearings, and the continued hearing on the United States' motion for adequate protections, sanctions, and other relief, conducted on August 28, 1987).

## V. Models and Forecasts: Future Loads and Future Costs

### A. Models and Forecasts Generally

Each of the going concern valuations presented relies upon load (or "power requirements") forecasts and revenue requirements (or "cost") forecasts prepared by various experts and consultants. The two different types of forecasts were developed from two different types of models. A review of the modeling process and the forecasts is pertinent to this discussion of valuation, because many of the assumptions implicit in the valuations are made explicit in the models and forecasts. The validity of the various assumptions and choices made at the model and forecast level affects the validity of the valuations which rely upon the forecasts.

The load forecasts were developed from load forecast models. Those models are econometric models "developed in order to forecast future loads of the 24 member cooperatives on the Wabash Valley system, both their residential and non-residential loads, energy and demand requirements to serve the ultimate customers." VII, pp. 5–6. These load forecast models predict

both the total energy required by Wabash's customers, measured in kiloWatt-hours ("kWh"), and the peak demand experienced by Wabash, measured in kiloWatts ("kW"), since in addition to supplying all the energy required over time by the REMCs' customers, Wabash must also have the capacity to provide the peak demand the system faces at any one moment. VI, p. 160.

The cost forecasts were derived from revenue requirements models. Since Wabash operates as a non-profit entity, the experts generally assumed that the revenue which Wabash requires is that revenue which will satisfy its costs.[1] The revenue requirements model is a financial model "designed to compute cost projections" of the expenses which Wabash will incur in the future "to serve the loads developed in the load forecast." VII, p. 6. Revenue requirements can only be forecast after the load has been forecast, since the forecasted load is an input to the revenue requirements model.

### B. REA Load Forecast Model

REA retained Pfeffer, Lindsay & Associates ("PLA") to prepare load forecast and revenue requirements models and to determine the value of Wabash from those models. VI, p. 173. Howard Stone ("Stone") from PLA developed both the load forecast model and the revenue requirements model. VI, p. 174.

Stone had never previously prepared a load forecast or a model designed to produce such a forecast. VI, p. 161. The models he developed were introduced into evidence as Government Exhibit 21, entitled *Task 1.C Report: Load and Revenue Requirements, Forecasting Model of the Wabash Valley Power Association, Inc., System.* In preparing the models, Stone primarily used data supplied to him by REA, including the reports filed with REA by Wabash and the member REMCs. Stone did not conduct any specific research into the economic conditions of rural central and northern Indiana, and did not request from the member REMCs any infor-

---

**1.** In this entry, a "cost" forecast or model is the same as a "revenue requirements" forecast or model.

mation about factors affecting the future growth of demand for electricity which would not appear on the reports submitted to REA.

Development of Stone's load forecast model required two steps. First, Stone developed average use per customer equations for residential and non-residential customers. Second, Stone used those average use per customer equations "to develop annual forecasts through the year 2000 for residential and non-residential average usage," which could be combined with projections of the number of customers to yield annual energy projections, which could in turn be used in the revenue requirements model. Government Exhibit 21, p. 4.

Recognizing that demand is a product of the number of customers and the average use per customer, Stone hypothesized the factors which might be determinants of average use and the number of customers. VII, pp. 7–9. Stone developed four recursive models setting forth his hypotheses: a residential customers model, a residential average use model, a non-residential customers model, and a non-residential average use model. Government Exhibit 21, p. 5.[2]

Stone's residential customers model specified that the principal determinant for the growth in residential customers historically had been the population in the service area of each cooperative. He then estimated 24 separate equations to develop projections of the number of customers on each distribution system. VII, p. 16.

Stone concedes in his report that the comparable rates for electricity charged by neighboring systems will also affect customer growth for the REMCs, but Stone did not use comparable rates as an independent variable in either the residential or non-residential customer forecasting equations, because of the difficulty of forecasting the rates which will be charged in the future by neighboring systems. Government Exhibit 21, pp. 6–7. In Appendix B to his report, Stone compared the rates of neighboring electricity suppliers historically and at present to those charged by Wabash's REMCs, and concluded that even with a 21% nominal wholesale rate increase for Wabash in 1986, there was "no reason to anticipate changes in rate relationships between [Wabash] distributors and its neighboring systems that should materially impact the growth in customers of [Wabash]." Government Exhibit 21, Appendix B, p. 21.[3]

As for the residential customers average use model, Stone reviewed historical average use per customer figures, and decided that the variables which may have determined average use for residential customers historically are: cooling degree-days, heating degree-days, per capita income (in turn a function of the consumer price index and employment), the price of propane gas, average use in the previous year, and an input value for future electrical prices at the retail level. VII, pp. 16–20.

Stone also hypothesized that the number of non-residential customers has been determined historically by population growth, the gross national product, employment, and the corporate bond rate. VII, p. 21. Stone believed average use per non-residential customer historically has been determined by the price of electricity, the price of natural gas, employment, and heating degree-days and cooling degree-days. VII, p. 22.

Stone believed his four equations would generate numbers similar to the actual historical changes in average use and number of customers. To test these equations, Stone then collected the information on the several determinants he had selected and plugged it into the models. VII, pp. 24–25.

Next Stone checked whether or not his equations generated numbers for average use and customers similar to the numbers which actually occurred from 1970 to 1985. Correlation analysis confirmed that Stone's equations produced numbers similar to the

---

**2.** Those models appear in Tables 1 and 2 of Stone's report.

**3.** Some of this information on comparable rates was presented graphically in Government Exhibits 24 through 30. See also VII, pp. 120–153, and VIII, pp. 1–25.

actual, historical figures for average use and number of customers. VII, p. 32.[4]

Up to this point in his work, Stone had been concerned with finding those factors which he believed historically influenced the demand for electricity, and not with attempting to predict that demand. Now Stone began the process of developing the econometric equations which would be used to forecast the number of customers and average use per customer in the future. Having determined what he believed to be the independent variables—the factors which determine average use—Stone specified two average use formulae, one for residential customers and one for non-residential customers.[5]

Stone's formula for average use per residential customer provides that average use is a function of own-price elasticity, cross-price elasticity, income elasticity, heating degree-days, cooling degree-days, and the average use from the preceding year. The formula for average use per non-residential customer provides that such use is a function of own-price elasticity, cross-price elasticity, employment, heating degree-days, cooling degree-days, and the average use from the preceding year.

The two formulae have two principal differences. First, the residential use formula compares retail propane gas prices to electricity rates for the cross-price elasticity variable, while the non-residential use formula compares retail commercial gas prices to electricity rates for that variable. Second, the residential use formula uses real per-capita income as a variable while the non-residential use formula uses employment as a proxy variable for income. Government Exhibit 21, p. 18.

After developing his formula for average residential use, Stone had to find the specific numbers to plug into the formula. Stone hoped to find one set of numbers which would predict the residential customer numbers for Wabash as a whole, but the variables resulting when Stone pooled the data from all 24 member REMCs did not yield results which were statistically valid and justifiable. VII, p. 47. Stone then determined that the distinct characteristics of each cooperative also precluded using the figures which resulted when he pooled the data from the REMCs based upon three load areas. The resulting variables were also unacceptable. VII, p. 47.

Finally, Stone tested the numbers which resulted when he pooled the data based upon the three power suppliers and seven different weather regions. VII, p. 48.[6] Any variable that lacked the proper sign or was of low statistical significance Stone dropped from the equation. VII, p. 59. The fourteen resulting equations each have different estimated elasticities, and the different equations produce numbers which match 81% to 98% of the historical movement in average use for the different cooperatives from 1970 to 1985. VII, pp. 52–53.

Stone performed the same sorts of analyses on the non-residential use numbers to yield appropriate non-residential average use equations. Eventually, he settled upon three equations, one for each of the primary IOUs. VII, p. 56.[7] Again, Stone simply dropped those variables which did not seem to be determinants. As with the equations developed to predict average residential use, the equations produced numbers which accurately matched over 90% of the actual historic movement in average

---

**4.** The Court does not believe that correlation analysis proves that the factors Stone focused upon determine average use and the number of customers. Rather, as the Court has noted, the factors and equations merely produce a series of numbers similar to the historical data for average use and number of customers. Further, even if Stone's work did establish that historically average use and number of customers had been determined by the factors Stone selected, the factors may not play the same role in the future. Of course, the same complaint can be made about most exercises in econome-

trics. See Wendell Gordon, *Institutional Economics: The Changing System,* (University of Texas Press 1980), pp. 113–114.

**5.** Those formulae appear on page 12 of Stone's report.

**6.** The fourteen resulting equations appear in Table 11 of Stone's report.

**7.** Those equations appear in Table 15 of Stone's report.

use for non-residential customers from 1970 to 1985. VII, pp. 69–70; p. 75.

Using the equations, Stone projected residential and non-residential average use through the year 2000. VII, p. 76. Multiplying the average use for each year by the projection for the number of customers in that year produced the total energy required for a given year. VII, pp. 75–76.

Finally, an additional equation estimated the demand by each cooperative to determine the capacity or maximum load imposed on the Wabash system at various times, measured in total kiloWatts. VII, pp. 76–77.

## C. REA Revenue Requirements Model

Stone then developed his revenue requirements model. The model is designed to predict the total costs which Wabash will experience in the future, and hence establishes the revenue which Wabash must earn to satisfy those costs. The revenue requirements model predicts a variety of costs: operating and maintenance costs of Gibson 5; fuel costs associated with Gibson 5; purchased power costs; operating and maintenance expenses; routine capital replacements and expenses; and administrative and general expenses. VII, pp. 79–80.

The most significant inputs to that model are the inflation rate, fuel costs, purchased power costs, and debt service. Government Exhibit 32, pp. 12–19. William Lindsay ("Lindsay") of PLA, who prepared the going concern valuation relied upon by REA, provided some of the predictions and assumptions used in the model. For example, Lindsay selected the rate of inflation and the capitalization or discount rate, the method and calculation of purchase power costs, the treatment of fuel costs, and the manner of treating debt service. VIII, pp. 91–92.

Using Stone's load forecast model and revenue requirements model, one can develop a stream of income available to pay debt service under different rate increase and inflation rate scenarios. VII, p. 88. Stone did not select the various scenarios. Lindsay selected the different rate increases and inflation rates. VII, p. 91. Stone showed in his report the income which his model predicts would be available under two different scenarios: one with 4% annual inflation and annual nominal rate increases equal to inflation, and a second with 4% annual inflation, a 21% nominal rate increase in 1986 and nominal rate increases equal to 4% inflation each year thereafter.[8]

## D. Load Forecast Model for Wabash

The record does not contain much information about the load forecast or revenue requirements models used by Wabash and its experts.

Wabash's load forecast model was developed by R.W. Beck & Associates, Inc. ("Beck"), for Wabash in 1984. XII, p. 107. Beck is in the business of preparing such models, and has extensive experience creating them. IX, p. 94. The Beck model has been a good predictor for Wabash for the few years that it has been in use. XIII, p. 42.

In Beck's model, forecasts for each of the 24 members are summed to derive the total energy and demand faced by Wabash. The determinants used in the Beck model differ slightly from those in Stone's models. While Beck supplied the models, Wabash projected and supplied all data for the underlying independent variables. IX, p. 95.

The load forecast prepared by Wabash is before the Court as Government Exhibit 5, entitled *1986 Revised Demand and Energy Forecast* (hereinafter "1986 Load Forecast"). This 1986 Load Forecast considered data from 1979 through 1985, and predicts energy and demand from 1987 through 2008.

The 1986 Load Forecast assumes that Wabash will purchase system participation power from CIPS to serve members in the NIPSCO area, peaking power from Detroit Edison and Consumers Power to serve members in the NIPSCO area, I & M supplemental power for the members in the I & M area, and PSI supplemental firm power for members in the PSI area. The 1986

---

**8.** The results appear in Stone's report as exhibits 5 and 6, respectively.

Load Forecast assumes that power costs will increase 3.5% per year on average over the time period predicted, that the annual long run growth rate for the number of residential customers will be 1%; that the number of persons per household will decline each year by .1%; that income per household will increase 6.4% in 1986, 7.1% in 1987, and by 1.5% from 1988 through 2008. The 1986 Load Forecast also uses the 30–year averages for heating degree-days and cooling degree-days, and presumes that the saturation rate (use of space heating, central air conditioning, and electric water heating) will not change. Government Exhibit 5.

### E. Wabash Revenue Requirements Model

For the preparation of its cost or revenue requirements forecast, Wabash again turned to Beck. The first analysis of future costs is contained in the Base Case section of Wabash Exhibit 16, entitled *Analysis of Annual Power Supply Costs for Wabash Valley's Members With and Without Wabash Valley.* That report is dated December 12, 1986, and is based upon the 1986 Load Forecast, Government Exhibit 5. IV, p. 61.[9] Hereafter, this forecast is referred to as the 1986 Cost Forecast.[10] The power cost forecast extends to the year 2020, but the 1986 Load Forecast only predicts loads through the year 2008. Beck assumed that the power and energy requirements of each service area would continue to grow at the annual rate equal to the projected growth for the years 2003 to 2008. Wabash Exhibit 16, p. 3. The 1986 Cost Forecast did not include any costs related to Marble Hill, because the valuation experts had determined that such costs had nothing to do with Wabash's going concern value. IV, p. 18.

The 1986 Cost Forecast assumes that Wabash will continue to purchase power from its present suppliers, and that Wabash would serve its members in the NIPSCO area with power and energy purchased from CIPS and Commonwealth Edison Company. Wabash Exhibit 16, pp. 2 and 7. The 1986 Cost Forecast also assumes that the Marble Hill to Columbus transmission line will not be completed, and that operations, maintenance, administrative, and general costs will escalate after 1986 at an annual rate of 6%. Wabash Exhibit 16, pp. 6–7. The actual assumptions used to project costs into the future do not differ significantly from the assumptions made by Stone and Lindsay in their revenue requirements forecast.

After completing projections using a 6% inflation rate, the Beck study also forecast power supply costs at 2% and 4% inflation. Wabash Exhibit 16, pp. 14–15.

Beck also completed a report supplementing the 1986 Cost Forecast. That report is dated February 19, 1987, and was introduced into evidence as Wabash Exhibit 17. Hereafter, that report is referred to as the 1987 Cost Forecast Supplement. The only changes made by the 1987 Cost Forecast Supplement to the 1986 Cost Forecast were the assumed use by Wabash of power from HE to serve the NIPSCO area members. Wabash Exhibit 17, p. 1. IV, p. 15.[11]

### Part Two

### VI. Valuation in Bankruptcy Generally

During the course of the evidence, the question which the Court has been asked to decide has occasionally been lost. Many issues presented in the briefs are raised prematurely, and should only be considered at confirmation, if at all.

---

9. Several witnesses testified that in developing the revenue requirements forecast Beck used data from a 1985 revised demand and energy forecast. XII, p. 115; Wabash Exhibit 16. However, it seems that such statements are incorrect, and that Beck actually used the 1986 Load Forecast. IV, p. 43.

10. A preliminary draft of that report was introduced as Wabash Exhibit 15.

11. Rick Setliff, a Wabash employee, suggested in his testimony that the 1987 Cost Forecast Supplement used the 1986 Revised Power Study Wabash prepared in October of 1986, but in fact that 1987 Cost Forecast Supplement states that it relied upon the same forecast used in the December 1986 Power Cost Forecast. Setliff's testimony at XII, p. 119. Wabash Exhibit 17, p. 2.

The Court has not been asked to order Wabash to raise its rates or to seek a rate increase. The State of Michigan is correct when it asserts that rates are the exclusive bailiwick of the PSC. Brief of State of Michigan and Michigan Public Service Commission, pp. 4–5. Section 1129(a)(6) does not give this Court any power to control Wabash's rates, but merely states that any plan by Wabash which includes a rate increase must be approved by the PSC before confirmation would become effective.

Contrary to some suggestions in the post-trial briefs, the PSC in its recent decision on the Rate Case has not indicated any willingness to defer to this Court on rate issues. Quite simply, this Court cannot order Wabash to raise its rates, and this Court cannot order Wabash to seek a rate increase from the PSC.

The Court need not determine whether the Contracts are assignable. Wabash raises the issue of assignability in its brief. Wabash Post-trial Brief, pp. 21–31. Going concern valuation assumes a transfer of all of Wabash's assets. However, the Court does not believe that such transfer would raise the assignability issue. *In re: Compass Van & Storage Corp.*, 65 B.R. 1007, 1012 (Bankr.E.D.N.Y.1986).

The Court is only seeking the value of Wabash pursuant to 11 U.S.C. Section 506(a). That section bifurcates a secured creditor's claim into a secured claim and an unsecured claim, depending on the value of the collateral. Valuation conducted pursuant to this section does not occur in a vacuum, but must be made in light of the purpose of the valuation. "[T]he statute makes reasonably clear that any valuation of collateral is temporal, and must take into consideration both the reason the valuation is being made and the contemplated disposition or use of the collateral." 3 *Collier on Bankruptcy* para. 506.04, p. 506–24 (15th ed. 1987); *In re: Datair Systems Corp.*, 42 B.R. 241 (Bankr. N.D.Ill.1984).

Here, Wabash is being valued as a prelude to consideration of a Chapter 11 plan, and the specific value the Court has been asked to find is the "going concern" value of Wabash. All the experts who presented valuation reports agree that the going concern value of Wabash is "the amount that a willing buyer would pay for the assets with a view to continuing to operate the assets as an integrated, income-producing enterprise." Government Exhibit 32, p. 1. Given that valuation is being determined in conjunction with the consideration of a plan, the Court is not looking for the value of Wabash as of the date the bankruptcy petition was filed, but seeks the value of Wabash as of the valuation hearings, early 1987, since the Court does not believe that the value will change significantly between that date and the date of confirmation. *In re: Klein*, 10 B.R. 657, 4 C.B.C.2d 412 (Bankr.E.D.N.Y.1981); *In re: Jones*, 5 B.R. 736 (Bankr.E.D.Va.1980).

Neither the Bankruptcy Code nor the case law provides much guidance to the Court on how to determine the going concern value of Wabash. Section 506(a) implicitly requires a case-by-case approach to valuation. *Barash v. Public Finance Corp.*, 658 F.2d 504, 512 (7th Cir.1981); *In re: Hemisphere International Center, Inc.*, 59 B.R. 289 (Bankr.S.D.Fla.1986). "[V]aluation should not be viewed as an exact science by any means. Thus a party in interest can rarely predict precisely a court's valuation of property in the absence of prior agreement among the parties." 3 *Collier on Bankruptcy* Paragraph 506.04, p. 506–25 (15th ed. 1987). Indeed, the author of *Collier on Bankruptcy* notes the "comparative paucity of valuation decisions in the context of large corporate cases with substantial amounts of property," and suggests that "with substantial amounts at stake the difficulty of predicting the outcome of a judicial valuation has encouraged parties to achieve consensual resolutions of valuation disputes." 3 *Collier on Bankruptcy* Paragraph 506.04, p. 506–25, n. 25 (15th ed. 1987).

Here, Wabash and REA have been unable to agree on the going concern value of Wabash, and their notions of the value range from under $200,000,000 to over $800,000,000 respectively. This Court must find "the elusive Pimpernel" that is

Wabash's going concern value. *In re: Jones*, 5 B.R. 736 (Bankr.E.D.Va.1980).

Value is a question of fact. Since the parties have requested the going concern value, the Court is only asked to determine what a willing buyer would pay for Wabash. In making this determination, the Court must consider the assumptions the willing buyer would make and the risks the willing buyer would perceive. The Court need not make any legal conclusions nor resolve any legal questions. For example, the Court need not decide whether the members contracts are voidable, but must decide only whether a willing buyer would perceive a risk that the contracts are voidable and alter its offer accordingly.[12]

The Court has reviewed each of the valuations presented to determine which incorporates the assumptions which a willing buyer would make, and which considers the risks which a willing buyer would perceive. Before reviewing each of the valuations individually, some general explanation of how the values were determined is appropriate.

### VII. Methodology: Capitalization of Income

All four of the valuation experts rely to some extent upon the "capitalization of income" method in determining the going concern value of Wabash. Under this method, some future stream of money is discounted to present value.

If the entity being valued operates for profit, then the stream of money which is reduced to present value is the stream of future net income. However, since Wabash is a not-for-profit entity, some other stream of money which can serve as an approximation for net income must be found. The experts diverged in their selection of the stream of money which could be reduced to present value to find Wabash's going concern value.

Lindsay, REA's valuation expert, defined "net income" as the revenue of Wabash less all its costs of operation. He labelled that amount for each year the "net revenue available to pay debt service." Lindsay used Stone's load and revenue requirements models with his own variables, including several different rate increase scenarios, to derive the stream of net revenue available to pay debt service. Then Lindsay reduced that stream back to its present value.

The experts retained by Wabash selected a different stream of money as the equivalent of Wabash's net income. They determined that the equivalent of the net income stream to Wabash is the savings which Wabash's members will realize in the future as a result of Wabash's continued existence. The stream of savings had been determined by Paul D. Reising ("Reising") of Beck, in his report entitled *Analysis of Annual Power Supply Costs for Wabash Valley's Members With and Without Wabash Valley*. Wabash Exhibit 16, denoted as "1986 Cost Forecast" herein. That report contains two sections: a "Base Case," analyzing the costs Wabash will experience in the future, and a "Dissolution Case," analyzing the costs which members would experience if Wabash did not exist.[13] Reising also determined a second stream of savings based upon the 1987 Cost Forecast Supplement. Wabash Exhibit 17. Deriving the stream of savings required Reising to subtract the Base Case results from the Dissolution Case results.[14] The valuation

---

**12.** Whether or not Wabash has demonstrated bad faith in failing to appeal the PSC decision in its Rate Case may be an issue at confirmation when the Court considers whether Wabash has satisfied the "good faith" requirement of 11 U.S. C. Section 1129(a)(3) by proposing a plan which does not include a rate increase. However, for the purposes of valuation, Wabash is not estopped from arguing that its rates cannot be raised, because the Court must analyze whether the willing buyer would perceive a significant risk that rates could not be raised to pay for Marble Hill.

**13.** The Base Case and the assumptions contained therein were discussed above in the section on Wabash's revenue requirements model.

**14.** The name "Dissolution Case" is misleading. The Beck report did not really assume any particular dissolution of Wabash, with all the costs and legal ramifications which would be inherent in such a dissolution. The Dissolution Case would be more properly labelled the "Non-Existence Case," because it attempts to determine costs to members if Wabash did not exist.

experts retained by Wabash used both of Reising's streams of savings in one manner or another to determine the going concern value of Wabash.

## VIII. The Specific Valuations
### A. Lindsay's Valuation

Lindsay received his Ph.D. in economics from Ohio State University in 1962, and from 1963 to 1982 worked for FERC and its predecessor, the Federal Power Commission. He considers himself a rate and regulation specialist, and since 1982 he has served as a consultant on rate and regulation matters. Lindsay has never before valued utility property, but he has reviewed the valuations performed by others. VIII, p. 60. Lindsay is not a certified appraiser. VIII, p. 65. Lindsay testified that he had been asked by REA "to testify concerning the going concern value of WVPA [Wabash] and the extent to which it may be able to raise rates sufficient to enable it to pay its expenses and service its debt, and repay its debt." VIII, pp. 73–74.

Lindsay used Stone's load and revenue requirements models to determine going concern value. He made several assumptions when using that model. He decided that inflation in the future will average 4% per year, that fuel costs for Wabash will increase the same as inflation, that PSI will be the long-term power supplier to Wabash, and that Wabash will service its entire debt, including the Marble Hill obligations. Government Exhibit 32, pp. 12–19.

After making these assumptions, Lindsay selected two rate increase scenarios. The first, labelled case A–1, provides for rate increases of 4% per year, equal to the rate of inflation.[15] Using Stone's model, Lindsay developed the net revenue available to pay debt service for the first 15 years, and then estimated that net revenue would increase by the same percentage each year thereafter. VIII, p. 99. Using a discount rate equal to the interest rate charged by the FFB, Lindsay valued the stream of net revenue and found that in case A–1 the present value of that stream, and hence the going concern value of Wabash, would be $495,000,000.[16]

Lindsay then attempted to find the minimum rate increase necessary to produce net revenues sufficient to allow Wabash to pay off of its debt. Again using Stone's models, Lindsay proposed a rate increase scenario, labelled case A–2, with a 21% rate increase in 1986 and increases of 4% per year thereafter. The present value of the stream of net revenue generated by Stone's models using this scenario and the FFB interest rate as the discount rate, and hence the going concern value of Wabash in case A–2, is $864,000,000.

### B. Critique of Lindsay's Valuation

#### 1. Introduction

■ The Court believes that the willing buyer would reject Lindsay's valuation for several reasons. First, the willing buyer would not assume that it could obtain a future large rate increase to recover the Marble Hill debt. Second, the willing buyer would perceive a significant risk that a large increase in rates, even if legally permissible, would result in a decline in the future stream of revenue because of political and economic repercussions. Third, the willing buyer would not use a discount rate as low as the one selected by Lindsay. Finally, the willing buyer would reject

---

**15.** The record contains much discussion about "real" as compared to "nominal" rate increases. A real increase would be one which raised rates more than costs increased as a result of inflation, while a nominal increase would be one which raised rates only as much as costs actually increased. Lindsay originally contended that a 4% per year increase would be only a nominal increase, not a real increase. On cross-examination, Lindsay admitted that only a certain percentage of Wabash's costs would increase with inflation, and that a rate increase equal to the rate of inflation would include some real rate increase. IX, pp. 17–27. The Court has chosen not to characterize the rate increases as real or nominal in this entry.

**16.** On cross-examination, Lindsay admitted that if the willing buyer of Wabash were unable to raise rates to recover sufficient funds to pay the Marble Hill debt, then the going concern value of Wabash would be "slightly less" than this figure. IX, p. 16.

Lindsay's valuation because it is not truly a going concern valuation at all.

2. The Rate Case and *NIPSCO* Decisions

A willing buyer would assume that both the recent PSC decision in Wabash's Rate Case and the ruling of the Indiana Supreme Court in *Citizens Action Coalition v. NIPSCO*, 485 N.E.2d 610 (Ind.1985) would preclude the purchaser of Wabash from raising rates to recover the Marble Hill debt. Lindsay dismissed the recent PSC decision in Wabash's Rate Case as erroneous, and attempted to avoid the effect of the *NIPSCO* decision by excluding IOUs from the class of prospective willing buyers.[17] However, even if the willing buyer were another cooperative, that cooperative would consider the PSC decision binding when making an offer to purchase Wabash because of the risk that the decision might not be overturned on appeal.

The situation here is similar to that faced by the prospective purchaser of a parcel of land that is the subject of a zoning dispute. That parcel was originally zoned for commercial development, but before the prospective purchaser made its offer, the local zoning board changed the zoning to residential or to some other use which reduces the value of the property to the prospective purchaser. While the decision to rezone the property may have been incorrect, the prospective purchaser would certainly consider the risk that the decision would be upheld before the prospective purchaser makes an offer on the property, and would value the property based upon the perception of the degree of risk.

Similarly, here the willing buyer would perceive a significant risk that the PSC decision in the Rate Case will be upheld. As Lindsay himself stated, a cooperative purchaser of Wabash would have to have "considerable confidence that they were going to be able to raise the rates" before they would be willing to spend over $800,-000,000 on Wabash. IX, p. 45. The reasoning and language of the *NIPSCO* decision and the PSC decision in the Rate Case do not give the Court "considerable confidence" that the latter decision is erroneous, and that Wabash's purchaser will be able to raise rates to recover for Marble Hill.

Both REA and CFC go to great lengths in their briefs to suggest that the PSC decision in the Rate Case contemplates that Wabash's plan before this Court will include a rate increase. REA's Post-trial Brief, p. 51. The section of the PSC decision cited says only that the PSC shall determine rates, and that the PSC leaves the "adjusting or ruling on matters of creditors' rights" to this Court. Wabash Exhibit 10, p. 7. Nor has the PSC conceded by its decision that it cannot reject a plan containing rates large enough to pay off all of Wabash's debts. REA Post-trial Brief, p. 54. The PSC has simply and clearly stated that Wabash cannot raise its rates to pay for Marble Hill.

Wabash can request a rate increase if necessary "to maintain its credit and meet its financial obligations." Wabash Exhibit 10, p. 14. However, the Court does not believe that the PSC would award to Wabash under the guise of preserving Wabash's credit the same rate increase that the PSC refused to allow in the Rate Case.

---

17. In his testimony, Lindsay retracted from this position and said that an IOU might indeed purchase Wabash despite the *NIPSCO* decision, because the rates the IOU would charge to Wabash's members would be controlled by FERC and not the PSC. Lindsay testified that FERC allows utilities to amortize cancellation costs over a reasonable period of time but does not allow IOUs to include cancellation costs in their rate base and earn a return on those costs. VIII, p. 129. Lindsay admitted that FERC's policy is under review. Further, while that may be FERC's policy concerning an IOU which had abandoned a nuclear power plant, it is not at all clear that FERC would allow the same recovery to an IOU which purchased a previously abandoned plant. Finally, the policy behind the FERC approach is the desire to share the burden of cancellation costs among ratepayers and stockholders. VIII, p. 131. That policy might not be satisfied at all here, given the purchase of an abandoned plant. *"[A]ssurance* of some real increase in rates probably would be necessary before any buyer would be willing to pay enough for [Wabash] assets to enable [Wabash] to pay off its debt." Government Exhibit 32, p. 25 (Emphasis added). Absent such assurance, the willing buyer would not assume the ability to raise rates, whether those rates would be governed by PSC or FERC.

This Court's decision should not be viewed as a conclusion by this Court that the PSC decision is correct. The Court is not usurping the power of the PSC or of the Indiana state courts which review the PSC's decisions. The Court is simply stating what it believes a willing buyer would assume and perceive about the ability of Wabash's purchaser to raise rates in light of the *NIPSCO* decision and the PSC's recent decision in the Rate Case.

3. Long-Run Effect of A Large Rate Increase

a. Introduction

Even if the willing buyer presumed that it could legally raise the rates charged to Wabash's members as high as proposed by Lindsay in case A–2, a willing buyer would not offer to purchase Wabash based upon the assumption of such a large increase, because a buyer would perceive a significant risk that the large rate increase would result in a decline in the stream of anticipated revenue. Unfortunately, explanation of the risks perceived by the willing buyer requires some discussion of rudimentary economic principles.

The price elasticity of demand (also called "own-price" elasticity) measures the percent change in quantity demanded which results after a 1% change in price. VI, pp. 95–96. Intuitively, for each percentage increase in price, the quantity demanded will decrease by some percentage. The price elasticity of demand is the slope of the demand curve. Since the demand curve generally slopes downward from left to right, the price elasticity of demand is generally a negative number.

Demand is "inelastic" if the absolute value of the elasticity is less than 1. In such a situation, while price increases, total revenue also increases because the decline in demand is less than the increase in price.

Demand is "elastic" if the absolute value exceeds 1. In such a situation, total revenue declines with any price increase because the quantity demanded declines by a greater percentage than the percentage increase in price.

A change in price will have both long- and short-run effects. In the short-run, purchasers of electricity will respond to a price increase by reducing use of existing appliances. In the long-run, purchasers of electricity will respond to a price increase by changing to natural or propane gas for heating purposes, and otherwise altering the saturation of electric appliances. VII, p. 38; XII, pp. 185–186.[18]

In his report and in his testimony, Stone spent considerable time discussing both the short-run and long-run price elasticity of demand for electricity at the wholesale level in the Wabash service area. VII, pp. 36–38, 72, 97 *et seq.* He determined that with the 21% rate increase proposed by Lindsay, the short-run price elasticity of demand which Wabash would face would be inelastic, at −.10, but that the long-run price elasticity of demand at the wholesale level would be elastic, at −1.66. VII, pp. 98–100. Stone further concluded that Wabash's residential load is more elastic than the non-residential load, and that the residential load would respond more quickly to a large rate increase. VII, p. 105.

Despite the projected long-run price elasticity on the wholesale level, both Stone and Lindsay projected that the net revenue available to pay debt service would continue to rise, because of the increase in the number of customers. VII, p. 102; VIII, p. 98. The Court is not so optimistic, because the Court has serious doubts about the reliability of Stone's models and the predictions about what will happen after a large rate increase.

Lindsay acknowledged the difficulty which economists have making predictions. VIII, p. 112; VIII, p. 155, IX, p. 77.[19] No

18. The Court believes that the short-run response to a price change appears on the demand graph as a movement along the present demand curve, while the long-run response would be depicted as a movement of the demand curve itself. No witness made this same distinction, however.

19. Lindsay himself served on a Federal Power Commission Committee on Load Forecasting in the late 1960's, but did not say whether the

economist can account for all the variables which affect the decisions of Wabash's ultimate consumers and thereby accurately predict future demand, nor can any economist accurately predict Wabash's future costs.[20]

For several reasons, the Court does not believe that the willing buyer would make the leap of faith taken by Stone and Lindsay and assume that customer growth will offset the effect of long-run price elasticity of demand. First, Stone's forecast may understate the effect of a large price increase. Second, the price-elasticity of demand may not be constant, and a rate increase greater than 21% may produce changes in consumer demand that would not be offset by customer growth. Third, customer growth may be overstated in Stone's forecasts. Finally, the forecasts ignore the elasticity of demand at the wholesale level.

### b. Understatement of Long-run Price Elasticity

The long-run price elasticity of demand on the wholesale level depends upon the long-run price elasticity of demand at the retail level. Government Exhibit 21, p. 37. Stone's forecast may understate the long-run price elasticity of demand at the retail level, and thereby understate the effect of a large price increase on retail demand.

Stone only considered the cross-price elasticity of propane gas for residential customers and commercial gas for non-residential customers. The model ignores the fact that many of the residential customers do have access to natural gas. II, p. 99. The model also cannot account for any new technology which might provide another

substitute for electricity purchased from Wabash, or which makes existing technologies more palatable and thereby alters the cross-price elasticity between electricity and the existing alternatives. Stone's prediction concerning long-run elasticity also does not consider the possibility that many ultimate consumers may be replacing their electric space heating in the near future.

Since the elasticity of demand at the retail level may be understated, the long-run price elasticity of demand at the wholesale level may be much greater than −1.66, after the 21% increase which Lindsay believes will raise sufficient revenue to pay off the Marble Hill debt. If the long-run price elasticity of demand actually exceeds −1.66 after a 21% rate increase, then projected increases in customer growth might not offset the effect of long-run price elasticity.

### c. Varying Long-run Price Elasticity

The elasticity of −1.66 derived by Stone may not be constant for all levels of price increases.[21] In other words, the demand curve which Wabash faces on the wholesale level may not be a straight line, and its slope may not be constant. If in fact the discount rate selected by Lindsay is too low, as discussed below, then Stone's model would have to be reworked with a higher discount rate, and the resulting lower present value would mean that a higher initial rate increase would be required if Wabash's purchaser is to repay all of the Marble Hill debt within the time period envisioned by Lindsay. That higher rate increase might raise the price of electricity such that the corresponding point on the

Committee had resolved the problems encountered in making such forecasts. VIII, p. 59.

**20.** For example, all the power cost forecasts relied upon PSI's predictions about when it will build new plants in the future. During the briefing period, PSI learned that its projections may be erroneous because of the new customer PSI has obtained, named Nucor. Nucor will build a steel mill in Crawfordsville, in PSI's service area, and will eventually be PSI's largest customer. Because of certain incentives given to Nucor by the State of Indiana, PSI's other customers, including Wabash, may eventually

pay more for electricity in order to subsidize Nucor. Certainly no economist could have predicted this development. *Indianapolis Star*, July 16, 1987, p. C–1, and August 27, 1987, p. C–1.

**21.** Even if economists could compute the value of elasticities in a satisfactory manner, "it would probably turn out that they would not have the desirable property of constancy along their length." Wendell Gordon, *Institutional Economics: The Changing System*, (University of Texas Press, 1980), p. 115.

demand curve would have an elasticity higher than −1.66. If so, then the rate increase needed to repay the Marble Hill debt would result in a greater decline in the average use per household than would occur under the 21% rate increase scenario, and the increase in the number of customers might be insufficient to overcome the resulting decline in power purchased.

#### d. Overstatement of Increase in Number of Customers

The number of future customers Stone hypothesized after a 21% rate increase might be overstated. If in fact the recent PSC decision in the Rate Case is overturned on appeal, the retail customers served by Wabash's members might revolt. Customers will not accept any reversal, particularly if the decision is based on REA's argument that the members of Wabash are like shareholders and as shareholders should bear the costs of Marble Hill.[22]

Many of the REMC members are already disgruntled with Wabash's rates, and would likely press for relief from any large rate increase. One way to obtain relief would be to alter the legislative monopoly granted to the REMCs. An REMC's monopoly over its customers is not a wholly natural one. That is, an REMC does not have a monopoly because it was the first to build the system of wires and substations to serve the customers in a geographic area not penetrated by any competing system. Retail customers could agitate for simple amendment of the statute which gives an REMC its monopoly, and amendment could allow individual members to flee their REMCs for IOUs or municipal suppliers.

In the alternative, the customers could challenge an REMC's monopoly on the

grounds that it is no longer providing "adequate" service as required by I.C. Section 8–1–2.3–4(a). Any massive departures from the REMCs would render erroneous Stone's projection that an increasing number of customers will more than offset the decline in average use per customer.

Finally, Stone's belief that the number of new customers will offset the decline in average use per customer may be unwarranted, since the increase in the number of customers may be affected, as Stone admits, by the comparable cost of electricity in other systems. While Wabash has historically charged rates lower than neighboring IOUs, no one can predict that Wabash's rates will still be lower in the future. Stone conveniently assumes in the appendix to his report that Wabash's rates in the future will be lower, but that assumption is based primarily on historical data. If in fact Wabash's rates become higher than those charged by neighboring suppliers, then the increase in the number of customers might be insufficient to offset the decline in average use per customer in the long run.[23]

#### e. Elasticity of Demand at the Wholesale Level

Finally, the willing buyer would reject the presumption that an increase in the number of customers would offset the effect of price elasticity of demand after a large rate increase, because Stone's prediction of long-run price elasticity at the wholesale level equal to −1.66 assumes Wabash's members will continue to purchase power from Wabash even after a large rate increase and will not attempt to break the Contracts.

REA has attempted to establish that the Contracts could not be rejected because of

---

**22.** The Court is not certain that the retail customers really are the equivalent of the stockholders of Wabash. A true shareholder could sell the stock if dismayed because he or she must bear the burden of the cancellation costs. An REMC member, however, has no stock to sell, and can only escape the burden of paying the cancellation costs by moving or by somehow securing a different source of electricity.

**23.** Stone's customer growth predictions might also be flawed because the time period he used, from 1970 to 1985, included a period of high growth which the Court does not believe will occur again. While Wabash's customer growth rate had been 7% in the late 1970's, in this decade that rate has slowed considerably, to the point where Wabash itself only assumes a growth rate of 1% overall.

the board resolutions passed by many of the REMCs. Those board resolutions affirmed the enforceability of the Contracts, and allegedly represent an acceptance by the REMCs of future rate increases necessary to pay for Marble Hill.

Those board resolutions do not accurately predict the future behavior of any of the REMC boards. Further, when the testimony of the various directors is read in the context of their depositions, it becomes apparent that many of the directors had no idea what the board resolutions meant or were intended to accomplish. X, p. 32, 68; XI, p. 183. When placed in historical context, the resolutions become even more suspect, since most were passed during the summer of 1984, when Wabash still hoped that Marble Hill could be salvaged as a coal-powered generating facility.[24]

REA has also attempted to establish that the REMCs are legally precluded from rejecting their Contracts. However, those Contracts have not been challenged in a bankruptcy context. The cases cited by REA would not necessarily deter the member REMCs from attempting to avoid the contracts through bankruptcy or some other means. Lindsay admitted that all 24 members would not have to be successful in rejecting their contracts before his "rate increase scenario would fail." IX, p. 70.

Member REMCs may also attempt to negate the Contracts in a less direct fashion, by challenging Wabash's legislative monopoly. Just as the retail customers might challenge the monopolies of the REMCs, the REMCs could seek a change in the law which grants the monopoly, or could argue that Wabash's service is no longer "adequate."

In any event, even if all the REMCs were ultimately unsuccessful in all attempts to reject the contracts, certainly the purchaser of Wabash may have to expend significant sums enforcing those contracts, a factor which a willing buyer would certainly consider when determining its purchase price. Finally, successfully preventing the REMCs from avoiding their Contracts would be a Pyrrhic victory if the retail customers abandoned the REMCs through any of the methods discussed above.

### 4. Discount Rate Too Low

The willing buyer would also reject Lindsay's valuation because the discount[25] rate selected is too low. Lindsay states that "the capitalization rate should reflect the current cost of capital to a prospective buyer of the business." Government Exhibit 32, p. 6. Yet for both his rate increase scenarios, Lindsay chose a discount rate of 7.434%, the rate charged by the FFB at the time Lindsay completed his report. That rate is only 25 basis points over the cost of money to the federal government. Only another cooperative—or some federal entity specifically created to purchase Wabash—would be able to borrow funds at this low rate.

To the extent that the willing buyer could only obtain financing at a higher rate, a higher capitalization rate would be required. The higher the capitalization rate required, the lower the present value of the stream of net income available to pay debt service, and consequently the lower the going concern value of Wabash.

■ The impracticality of the discount rate Lindsay selected is more apparent when his definition of the appropriate rate is compared to the definitions used by the other experts. The appropriate discount rate is not the rate which a prospective purchaser would have to pay on its debt, but is the rate of return which a potential purchaser could receive on other invest-

---

**24.** The portions of the depositions read into the record also contain many statements by the directors that the REMCs will attempt to escape their Contracts if forced to pay for Marble Hill or if any rate increase is too steep. IX, p. 153, XI, pp. 24, 52, 81, 140. Several of the directors also stated that a rate increase would create problems for residential customers. XI, pp. 69, 137, 171, 191.

**25.** The experts have used the term "capitalization rate" and "discount rate" interchangeably. This Court uses the term "discount rate," because that term reflects that the rate is used to discount future streams of money to the present.

ments of comparable risk. The discount rate reflects the opportunity costs faced by the prospective purchaser. III, pp. 57–58. The greater the risk of the particular investment, the greater the return the prospective purchaser will demand, and the greater the discount rate should be. III, p. 59. By choosing a low discount rate Lindsay was presuming that the purchase of Wabash presents only slightly more risk than the purchase of Treasury bonds. IX, p. 37.

The risks associated with investing in Wabash are much greater than those associated with purchasing government bonds. Wabash is in bankruptcy. Wabash has only existed in its present form, as a G & T actually providing power, for approximately 10 years. Given the present economic and political climate in Indiana, an investment in Wabash is certainly more risky than an investment in Treasury bonds.[26]

REA suggests in its Post-trial Brief, p. 18, that Lindsay's valuation did not need to add a risk factor to the discount rate because the risk was already included in the valuation. REA seized upon the testimony of Dr. Shannon Pratt ("Pratt"), a rebuttal witness called by Wabash, who testified that risk can be taken into account either through adding a risk premium to the discount rate or making a "probabilistic assessment" of what the future earnings will be. XVIII, p. 90–101. REA states that because Lindsay's evaluation uses econometric equations, it necessarily includes a probabilistic assessment of risk, and no increase in the discount rate is warranted. However, the REA's conclusion does not necessarily follow from its premise. REA cited no testimony by Stone or Lindsay that their models and forecasts included an assessment of risk. Wabash's experts also used econometric models, but they did not presume that use of such models meant that risk had already been considered.

### 5. Not a True Going Concern Valuation

Finally, Lindsay's valuation would be rejected by the willing buyer because it simply is not a going concern valuation as this Court understands the term. Lindsay agreed that the going concern value is that which a willing buyer would pay for Wabash with the intention of operating it as an income-producing enterprise. VIII, p. 74. Yet Lindsay then assumed that Wabash would continue to be operated as a not-for-profit cooperative. By looking only to the stream of net revenue available to pay debt service, Lindsay implicitly assumes that the willing buyer would purchase Wabash for the sole purpose of repaying the REA debt, since the net revenue available to pay debt service would be entirely committed to debt service and would not leave any actual net income, or return, to the purchaser.

Even with Lindsay's 21% rate increase scenario, the willing buyer would not generate sufficient net income to satisfy debt service for 10 of the first 11 years, and would actually show a deficit of $77,000,000 for that period. IX, p. 31. In order to generate net revenue sufficient to pay the debt service as well as provide some return to the purchaser, the initial rate increase would have to be greater than 21%.

The Court believes that a proper going concern valuation requires the assumption that the purchaser will be interested in making a profit, even when the entity being valued is presently not being operated for profit. The Court does not believe that a willing buyer would be interested in purchasing Wabash with its Marble Hill debt intact, even under the 21% increase scenario, because of the significant losses which the purchaser would incur in the first decade.

Lindsay's going concern valuation is also not a true going concern valuation because of the limited number of prospective purchasers who would act using his assumptions. The "willing buyer" concept in go-

---

26. Note that by using a low discount rate, Lindsay did not need as large a net revenue stream available to pay debt service as he otherwise would have, and as a result was able to select the 21% rate increase scenario. If Lindsay had selected a higher discount rate, a larger stream of net revenue available to pay debt service would be needed to pay off the Marble Hill debt, and a higher rate increase would be needed to generate that stream of revenue.

ing concern valuation requires the Court to envision a hypothetical purchaser. *In re: Beker Industries, Inc.*, 58 B.R. 725, 739 (Bankr.S.D.N.Y.1986). A true going concern valuation should not consider a specific purchaser, but should look to the widest possible array of purchasers.[27]

When the industry of the entity being valued is unregulated, the going concern valuation implicitly assumes a free marketplace. *Malley-Duff & Associates v. Crown Life Insurance Co.*, 734 F.2d 133 (3rd Cir. 1984). The willing buyer of an entity operating in an unregulated industry is presumed to be one whose purchase of the going concern will not enable the purchaser to affect prices in the marketplace, because the ability to affect prices would mean that the going concern value is higher for that particular purchaser than it would be for others, and that the prospective purchaser who would obtain oligopoly or monopoly power as a result of the purchase would pay a premium for the entity—not the true going concern value in the abstract sense.

In a regulated industry, the notion that the "willing buyer" will have no influence over price must be abandoned. Indeed, all of the valuations presumed that the purchaser of Wabash would be able to raise rates at least to recover any increases in costs. However, the Court believes that the concept of the "willing buyer" still requires that the valuation of a regulated industry only consider the ability to raise rates when any possible purchaser could do so. Here, Lindsay has proposed a rate increase scenario and a resulting valuation of over $800,000,000 that might not apply to any IOU which would purchase Wabash, even if FERC in fact would govern that IOU's rates to the REMCs. By excluding these REMCs, Lindsay has improperly nar-

rowed the scope of the valuation, and has changed his report from a valuation to something else. Dr. Pratt agreed, and testified that Lindsay's report is not a true valuation that would be accepted by a qualified appraiser. XVIII, pp, 34–35, 46.

When asked what he was assigned to do in his report, Lindsay stated first that he had been asked to determine whether or not Wabash's rates could be raised sufficiently to enable Wabash or its purchaser to pay the Marble Hill debt. IX, p. 21 *et seq.* His objective was to see how much rate increase would be required to extinguish the debt. IX, p. 86. Only after stating his first objective did Lindsay mention that he was also retained to prepare a going concern valuation of Wabash. The order in which Lindsay recalls his objectives is revealing. His report is not a valuation, but a position paper which could be used before the PSC to establish that Wabash could raise its rates as high as proposed.

The Court has already rejected Lindsay's valuation because the Court does not believe that a willing buyer would make the assumptions that he has made. The Court must also reject Lindsay's report because it does not have as its primary purpose the valuation of Wabash. Rather, the primary purpose of Lindsay's report seems to have been to prove that Wabash could raise its rates sufficiently to repay the Marble Hill debt.

The Court concludes that a willing buyer would not base its offer to purchase Wabash on the values expressed in Lindsay's report.

### C. Lewellen's Valuation

Dr. George Lewellen ("Lewellen"), the first of Wabash's valuation experts, re-

---

**27.** REA is not in the class of prospective "willing buyers" Because REA has a security interest in some of Wabash's assets. At any sale of Wabash, REA could bid in the amount of its security interest. 11 U.S.C. Section 363(k). If REA or any secured creditor could be one of the hypothetical purchasers in a going concern valuation, then "going concern value" would never be less than secured debt. Such a result is surely not the result intended by 11 U.S.C. Section 506. Similarly, the Court also believes that the group

of hypothetical purchasers should only include entities which presently exist or which might reasonably be expected to come into existence for the purpose of purchasing a going concern. The non-existent government entities conjectured by Lindsay in his report cannot reasonably be expected to come into existence, given present political realities. Therefore, the Court has not discussed such governmental entities in this entry.

ceived his Ph.D. in management, with a major in finance, from MIT in 1967. He has been on the faculty at Purdue since 1964, and now serves as lead professor of management and as director of the School of Executive Education. He has served as a private consultant for over 15 years, and much of his consulting has had to do with valuations. IV, p. 133.

Lewellen prepared two valuations, one in August of 1986 and one in March of 1987. The valuations are before the Court as Wabash Exhibits 19 and 20. Lewellen accepted the fact that Wabash is not operated for profit. Wabash Exhibit 19, p. 1. He determined that the going concern value of Wabash depends on its equity value, and that the equity value of Wabash would be the savings experienced by Wabash's members, because such savings "are something like the profits that a normal equity investor in a profit-making firm would realize." IV, pp. 141–142.

Lewellen used the cost savings derived from the Beck Base and Dissolution Cases and used the discounted cash flow approach to determine the present value of those future savings. He believed that present value turns primarily on three factors: the time horizon used, the cost savings estimates, and the relevant discount rate. Wabash Exhibit 19, p. 3.

Lewellen chose a 35–year time horizon, from 1986 to 2020, and decided to add to the sum generated from valuing the savings figures for those 35 years some residual element to account for the value of cost savings after 2020. In his first valuation, Lewellen used the cost savings estimated in the 1986 Cost Forecast.

Lewellen defined the appropriate discount rate as that rate "which would apply as a return requirement for an equity investment in an electric utility under current financial market conditions ..." Wabash Exhibit 19, p. 4. To determine the discount rate, Lewellen used the capital asset pricing model, because the "relevant dimension of the risk incurred in making an investment is its systematic risk—the extent to which its returns vary over time in syn-

chronization with the returns of other available investments." Wabash Exhibit 19, p. 5.

The required return on a risky investment must include a risk premium. That risk premium is the "function of the return premium offered by the average of all risky investments viewed collectively" and the "beta" coefficient of the specific investment being considered. Wabash Exhibit 19, p. 5. The greater a particular investment's beta coefficient, the higher the return required by investors because the greater the "relative volatility" of that investment. Wabash Exhibit 19, p. 6.

Lewellen chose a beta coefficient similar to the beta coefficient for electric utility common stocks. That coefficient is .70. Wabash Exhibit 19, p. 7. In essence, Lewellen determined that the investment in Wabash is only as risky as any other investment in electric utility common stocks. Lewellen then estimated the average return premium on a stock portfolio from 1946 to 1985, and determined that the risk premium rate is 8.4%. The risk-free rate, that on long-term government bonds, was 7.5% at the time Lewellen did his report. Using the capital asset pricing model, Lewellen determined that with these rates and the chosen beta, the discount rate which should be used in valuing the cost savings generated by Wabash is 13.4% if the escalation rate [28] is 4%. The discount rate would go up by 2% if inflation were 6%, and down by 2% if inflation were 2%. Wabash Exhibit 19, p. 8.

Lewellen finally valued the cost savings at three different escalation and discount rates, added in a residual value for cost savings after the year 2020, and then added back the $155,400,000 of currently outstanding debt of Wabash associated with its "used and useful" assets. Wabash Exhibit 19, pp. 10–11. The going concern values Lewellen generated vary from $211,500,000 at 2% inflation to $212,100,000 at 6% inflation.

Lewellen's March 1987 valuation, Wabash Exhibit 20, changed the original re-

---

**28.** "Escalation rate" is a euphemism for the in- flation rate.

port for two reasons. First, Reising had provided additional cost savings estimates based upon the potential supply contract with HE instead of CIPS, which were contained in the 1987 Cost Forecast Supplement. Second, Lewellen wished to test the sensitivity of his analysis by using discount rates a percentage point above and below those originally selected. The change resulted in a range of going concern values, from $204,100,000 at 4% inflation and a 14.4% discount rate to $231,900,000 at 6% inflation and a 14.4% discount rate.

### D. Critique of Lewellen's Valuation

### 1. Determination of Cost Savings

REA and CFC criticize the assumptions made in the Dissolution Case and the manner in which cost savings were determined. The assumptions which they challenge can be divided into two categories: those which actually were made, and those which REA or CFC believed were made.

When Reising prepared the Dissolution Case he did assume that without Wabash the various members would form four subgroups, one for each of the IOUs which supply the members. He then made certain assumptions about the costs of administering power purchases and doing some limited coordinated billing and administrative activity. IV, p. 77. The assumption that four subgroups would form for the purpose of coordinating certain activities and saving money is reasonable. REA did not present any evidence to show why such assumption is unreasonable.

Reising also assumed that the four subgroups would be able to purchase power from the IOUs at the same rates at which Wabash purchases power. This assumption is also reasonable, at least for the short term, given the excess capacity of the IOUs and the fact that several of the IOUs have only reluctantly recognized Wabash's existence in the first place. IV, pp. 93–94.

The other assumption most challenged by REA is the assumption that the subgroup of members in the NIPSCO area would be able to wheel power over NIPSCO's lines just as NIPSCO does. Lindsay testified that any NIPSCO tariff would not apply to all-requirements customers like the members of Wabash. VIII, p. 157. On cross-examination, Lindsay retreated from this position, and stated that he was not aware that NIPSCO had a tariff on file for the wheeling of power to distribution cooperatives. IX, p. 95. Reising contended that his assumption concerning the existence of such a tariff is reasonable. IV, p. 111. Given the importance of the existence of the tariff, the Court would think that one of the parties would have established conclusively whether or not a tariff exists.

On the whole, the witnesses testifying for Wabash seemed more convinced of the tariff's existence than REA's witnesses seemed convinced that the tariff did not exist. The Court believes that the tariff either is on file, should be on file, or that the members in the NIPSCO area could wheel power over NIPSCO's lines after some legal wrangling.

Finally, the Court believes that ignoring all costs associated with Marble Hill when making the Base and the Dissolution Cases was reasonable. As noted above in the discussion of Lindsay's valuation, the Court believes that the willing buyer would not assume it possible to recover for any of the Marble Hill investment, or would perceive great risk in attempting to do so, and would reduce its offer accordingly.

As to those assumptions which the REA found but which were actually not made, the Dissolution Case does not assume that each of the members could break its Contract with Wabash without any repercussion or expense. Reising never specifically assumed that the Contracts would be broken. IV, p. 96. He only assumed that if Wabash did not exist then its members would be free to enter new contracts. The focus is on the cost which members would experience if Wabash did not exist, and not on the costs which members would experience in dissolving Wabash.

Reising also did not assume that the subgroups would obtain long-term contracts with the IOUs. IV, pp. 115–116. The subgroups may have some difficulty obtaining long term power supply con-

tracts, but even if able to obtain those the rates would not be fixed. In a long-term power supply contract the power supply cost increases are passed through. IV, p. 87. Therefore, a long-term power supply contract may not provide much by way of actual cost savings, and the potential inability to enter into such a contract does not significantly affect the costs which the subgroup would experience without Wabash.

The Court rejects each of the challenges to the Dissolution Case, and concludes that the assumptions made in determining the stream of savings are reasonable.

## 2. Rejection of Lewellen's Valuation

REA and CFC criticize Lewellen's valuation because it fails to add to equity any of the Marble Hill debt. Lewellen excluded the Marble Hill debt because Marble Hill would not be an available and productive asset to a potential purchaser. IV, pp. 166–167, p. 172. The equity value of the owner-members, which is what Lewellen focused on, would be unaffected by the Marble Hill debt. IV, p. 173. Even if the Marble Hill assets generated some revenues, Lewellen would not have added the debt to his valuation unless those revenues were enough to make up for the extra claims against those Marble Hill assets. IV, p. 230.

REA cross-examined Lewellen about which of Wabash's debts should be added to the equity they had determined. Lewellen defended his decision throughout his testimony. REA presented no testimony by any appraisal expert to establish that appraisal theory requires the addition of the Marble Hill debt to the equity values derived by Lewellen.

Although the Court rejects the challenges of REA and CFC to the Dissolution Case, and has determined that Lewellen added the appropriate debts to equity, the Court has problems with Lewellen's valuation because it does not seem to contemplate the sale of Wabash to a third party. Lewellen's value seems to be the value which would be placed on Wabash by its members—but the members are not the "willing buyer" contemplated in going con-

cern valuation theory. Therefore, the Court will not use Lewellen's methodology in determining the going concern value. However, the going concern value which the Court ultimately selects may not be that different from the values which Lewellen derived.

### E. Kovich's Valuation

S. Paul Kovich ("Kovich") is a senior vice-president with Shearson-Lehman Brothers in New York City. He has an M.B.A. with a specialization in accounting from Columbia University. His firm serves as lead investment banker for CFC for most of CFC's public debt offerings. Most of Kovich's work involves valuations. V, p. 12. He attempted to value Wabash as an investment banker would, using a market valuation approach. V, p. 17.

Under this approach, Kovich estimated Wabash's value by comparing Wabash to other electric utilities and determining what Wabash would sell for if taken public. Kovich's approach relies only indirectly on the capitalization of income approach used so heavily by the three other experts. Like the other experts retained by Wabash, Kovich prepared two reports, which are before the Court as Wabash Exhibits 21 and 22.

The methodology used by Kovich is the same as that used in preparing the initial public offering of a formerly private corporation. Kovich first developed an understanding of Wabash and the dynamics of the G & T business, and then selected comparable public companies to derive a range of hypothetical valuations.

Before using his methodology, Kovich first had to restructure Wabash as a for-profit, tax-paying institution. Wabash Exhibit 21, p. 2. He assumed that Wabash as a for-profit institution would receive a rate increase to allow for some return to investors, but also believed that the rate increase would be limited by the competition which Wabash faces in the wholesale power supply market. Kovich believes that Wabash operates in a "very competitive bulk power supply market." V, p. 18. Because of this assumption, Kovich also be-

lieves that Wabash as a for-profit corporation would not be able to raise rates above those charged by neighboring IOUs, and that therefore the income which would be generated by a for-profit Wabash would be the same as the cost savings experienced by member REMCs as a result of the continued existence of Wabash. Wabash Exhibit 21, p. 2.

Kovich then used the Dissolution Case to prepare income, cash flow, and capitalization statements for Wabash so that Wabash could be compared to other IOUs. Wabash Exhibit 21, p. 2. In doing so, Kovich made assumptions concerning depreciation, because that element is not a part of Wabash's existing financial information. Wabash Exhibit 21, p. 3. He also had to assume that the non-Marble Hill debt would retain the same terms and conditions.

Kovich chose size as the most relevant measure of comparability, and selected seven IOUs to compare to Wabash. All seven are publicly traded utilities, but all are vertically integrated. Wabash Exhibit 21, pp. 3–4. Wabash is not vertically integrated, since it is only in the business of generation and transmission and does not distribute to ultimate consumers.

In comparing Wabash to the seven IOUs, Kovich focused only on the financial information of Wabash from 1986 through 1990, because the price/earnings multiple selected is designed to capture any expected growth in earnings as well as the appropriate discount rate to be applied to future earnings. Wabash Exhibit 21, p. 6.

The average net income Kovich predicted Wabash would generate from 1986 to 1990 is $3,695,400. Wabash Exhibit 21, p. 6. To that income, Kovich applied a range of price/earnings multiples to derive a range of valuations.

Kovich concedes that selection of the price/earnings multiple is the most subjective phase of his methodology. Wabash Exhibit 21, p. 6. The range of price/earnings multiples for the seven comparable IOUs was from 8.4x to 17.0x, with an average of 13.2x. Wabash Exhibit 21, p. 7. For Wabash, Kovich selected a price/earn-

ings multiple ranging from 8x to 10x. That range produced valuations of Wabash's equity from $29,563,200 to $36,954,-000. To the equity, Kovich added the non-Marble Hill debt of $155,174,000 and Wabash's current liabilities of $25,758,000, the liabilities associated with the productive side of Wabash's business. V, p. 61. Kovich added current liabilities because going concern value represents all financing required to support business activities, and he included the non-Marble Hill debt because it represents the debt financing of productive assets. V, p. 51. Addition of these liabilities produced total going concern values ranging from $210,495,200 to $217,886,000, all at a 6% inflation rate.

Kovich also prepared a second report, which altered the net income figures because of the possibility of a long-term power supply contract with HE, and recalculated valuation using both a 4% and 6% inflation rate for both the original CIPS scenario and the new HE scenario. Those valuations range from $203,756,000 at 4% inflation, HE as supplier, and a price/earnings multiple of 8x, to $218,382,000 at 6% inflation, CIPS as supplier, and a price earnings ratio of 10x.

### F. Critique of Kovich's Valuation

The most challenged of Kovich's assumptions is his belief that the purchaser of Wabash could not raise rates at all above the levels charged by surrounding IOUs. REA and CFC contend that Kovich had no evidence to support his assumption. The Court disagrees.

The record is replete with evidence that a rate increase of any significance will create problems for Wabash and its member REMCs. The REMCs would consider breaking their contracts. Wabash Exhibits 46 and 49. Some directors stated that they might not seek a rate increase to pay for Marble Hill, but would seek other options. Wabash Exhibit 36, 48.

Several of the Wabash directors deposed by REA stated that the members of their respective REMCs would "revolt." Wabash Exhibits 28, 42. Others stated that

any rate increase would lead to customer unrest. Wabash Exhibits 34, 36, 37, 38. Many testified about the depressed economic conditions in the areas serviced by their REMCs, noted that delinquent and unpaid accounts have increased in the last two years, and concluded that customers simply could not afford a rate increase. Wabash Exhibits 27, 28, 29, 31, 32, 36, 39, 42, 43, 44, 50. Even those REMCs which do not have collection problems now expect that a rate increase would lead to such problems. Wabash Exhibit 37.

The Court also has before it evidence of the competition which Wabash faces with natural gas for the space heating market. II, p. 99; XIII, pp. 45–46. For example, between 25 and 50% of the customers of Whitley County REMC have natural gas available to them. Wabash Exhibit 37. Another director testified that his REMC could not sell electric heat to newly constructed homes because the rates are too high. Wabash Exhibit 44. Still others spoke of the customers who have or will change to propane gas for heating because of rates. Wabash Exhibit 49.

Again, REA challenged such testimony through cross-examination, but never produced any evidence of its own to refute the statements of Wabash's witnesses. Neither Stone nor Lindsay researched the unique aspects of the market in which Wabash and its member REMCs must operate.[29]

In response to such criticism, Kovich said that it was not essential to his valuations that the Contracts would be broken if rates exceeded those charged by neighboring IOUs. Rates above the levels of neighboring IOUs would create the risk that the contracts would be broken and this risk is sufficient to limit the going concern value of Wabash. V, p. 78.

Kovich also testified that even if the PSC allowed Wabash to raise its rates to pay the Marble Hill debt, he would not increase his valuation by adding in the Marble Hill debt because he does not believe that the revenue could be raised to support that debt. V, p. 65. "Value is value. It's a function of cash flows, but then and now, to the extent that you simply get permission from a regulatory agency to include it in rates doesn't mean that the principal and interest is going to be recovered, and [sic] if in the process you destroy the business." V, p. 77.

Kovich's valuation simply recognized certain risks jeopardizing the ability of a willing buyer to raise rates without adversely affecting the stream of money flowing in to Wabash. The Court has recognized the same risks before. Because the willing buyer would perceive the risk that member REMCs will attempt to break their contracts if rates rose above those charged by surrounding IOUs, as well as the risks that retail customers will switch away from electric space heating, or will simply be unable to pay an increase, the willing buyer would value Wabash as if the rates of neighboring IOUs cap the rates Wabash can charge.

However, the Court still must reject Kovich's valuation because the Court does not believe that anything on the publicly traded markets compares sufficiently with Wabash to justify a valuation using Kovich's approach. Wabash is a unique operation, with quite unique circumstances, including the fact that it is in bankruptcy. While the ultimate value selected by this Court may be close to the valuations which Kovich derived, the Court cannot sanction the method by which those results were achieved, and does not believe that a prospective purchaser would attempt to value Wabash on these terms.

### G. Gross' Valuation

Robert Gross ("Gross") works for American Appraisal Associates, Inc., "the world's largest valuation firm." V, p. 103.[30] He

---

**29.** REA and CFC also challenged Kovich's valuation because of the failure to add the Marble Hill debt to the equity value. The Court has already concluded that failure to add such debt is appropriate. REA presented no witness with appraisal experience who testified that the debt should be added.

**30.** American Appraisal Associates, Inc., and its subsidiaries have extensive experience valuing properties in the bankruptcy context. See, for

has a master's degree in finance from the University of Wisconsin at Whitewater. Gross works primarily in valuations, especially going concern valuations for merger and acquisition purposes. He attempted to value Wabash as seen through the "eyes of a prospective investor in 100% of the firm, and that is to say some profit-oriented concern." V, p. 113.

Gross prepared two valuation reports, introduced as Wabash Exhibits 24 and 25. The first report is stamped "Draft." Gross defined the going concern value of Wabash as the price which would be reached by "a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under compulsion, and with equity to both." Wabash Exhibit 24, p. 4. Like Lewellen and Lindsay, Gross chose the income approach to the valuation of Wabash and decided to discount to present value Wabash's long-term cash flows. Wabash Exhibit 24, p. 5.

Like Kovich, Gross assumed that the purchaser could raise rates in order to achieve a return on its investment, but that such increase in rates would be limited by the rates charged by surrounding IOUs, because Wabash's membership is "rate-sensitive, as evidenced by the very existence of" Wabash. Wabash Exhibit 24, p. 6. Gross assumed that if Wabash's rates stayed on a level of parity with those charged by neighboring IOUs, the members of Wabash would not desert the new purchaser. Wabash Exhibit 24, p. 7.

Because of this perceived ceiling on the rates which a for-profit purchaser could charge, Gross was able to use the cost savings to members from Wabash's continued existence as an approximation of the profits which a purchaser would experience. Like Kovich, Gross altered the Dissolution Case data to see how it would appear were Wabash operated for profit. Wabash Exhibit 24, p. 7.

Gross used a debt-free cash flow model. With such a model, he did not have to consider specific debt and equity financing for a particular project. V, p. 120, Wabash Exhibit 24, p. 8. This approach recognizes

that any investor would seek a balance in the pool of funds used for the investment, that is, a balance of debt and equity. Use of this model required Gross to restate cash flow projections and remove any items relating to financing. These debt-free cash flows, when aggregated to present value, "represent aggregate value of invested capital." Wabash Exhibit 24, p. 7. Invested capital is defined as the "combination of debt and equity of the business enterprise." Wabash Exhibit 24, p. 7.

The debt-free net cash flows yield a theoretical return on invested capital. The discount rate can be determined by calculating the weighted average cost of the invested capital. Wabash Exhibit 24, p. 8. The discount rate reflects "a certain mix of debt and equity of comparable firms." Wabash Exhibit 24, p. 8. The cost of debt is based upon the current yields on bonds issued by utility and industrial companies. The cost of equity Gross based upon the current yield on the equity issues of utility companies. To find this cost of equity, Gross used the capital asset pricing model. Wabash Exhibit 24, p. 8.

Gross calculated the weighted average cost of capital by assuming a 60/40 debt to equity mix, using a beta coefficient of .70—the same one used by Lewellen—long-term interest rates ranging from 8.27% to 10.87%, risk-free interest rates ranging from 6.89% to 7.28%, an equity premium of 8.40% and a tax rate of 36.6%. Wabash Exhibit 24, p. 8.

Gross added a risk premium because he believed that a hypothetical purchaser of Wabash would view an investment in Wabash as riskier than the firms compared. Wabash Exhibit 24, p. 9. However, because Gross believes that Wabash would be viewed by investors as only slightly more risky than the median investment, he only added .5% to 1% to the discount rate as a risk premium. V, p. 127. With the addition of this risk premium, Gross determined that the appropriate discount rate would be 9.4% to 9.8%. He then calculated the present value of the cost savings from the

example, *In re: Fiberglass Industries, Inc.,* 74 B.R. 738, 742 (Bankr.N.D.N.Y.1987).

Beck Dissolution Case for 1986 through 2020, and added a residual value for savings after 2020. Wabash Exhibit 24, p. 9.

With a 9.6% discount rate, the going concern value of Wabash found by Gross is $220,838,000. Wabash Exhibit 24, p. 11.

Gross' second valuation is based upon the HE supply scenario. That valuation, dated March 10, 1987, is Wabash Exhibit 25. That report adds assumptions concerning the inflation rate, using both 4% and 6%. The resulting valuations range from $173,488,000 under the CIPS supply scenario with 4% inflation and a 9.8% discount rate, to $243,172,000 under the HE supply scenario with a 6% inflation rate and a 9.4% discount rate.

### H. Critique of Gross' Valuation

REA approved of the methodology which Gross employed, but disapproved of his assumption that the Contracts would be broken. REA Post-trial Brief, pp. 49–50. CFC also challenged Gross' conclusion that Wabash's members are rate-sensitive. CFC Post-trial Brief, pp. 49–50.

On cross-examination, Gross admitted that he did not perform any independent analysis to determine the fragile nature and rate sensitivity of Wabash. V, p. 147. However, he also stated that he would not do an appraisal based on the assumption that the wholesale power supply contracts cannot be avoided, that the PSC will approve higher rates for Wabash's purchaser to enable the purchaser to recover for Marble Hill, and that those rates could be paid by members and revenues could be generated on the basis of those rates. "Anybody that makes those computations based on that list of assumptions would be doing nothing more than creating a hypothetical that would in my judgment be beyond the realm of reason." V, p. 163.

The Court has already discussed the ample evidence in the record which supports the belief that a willing buyer would assume that the rates charged by neighboring IOUs cap the rates which Wabash can charge. Even if the REMCs do not respond to a rate increase by rejecting the Contracts, the response of retail purchasers would have the same, detrimental effect on Wabash's revenues.

REA also does not challenge the discount rates selected by Gross. REA contends that the discount rates chosen by Gross do not differ significantly from the rate selected by Lindsay. REA Post-trial Brief, p. 50. But Gross selected rates that are approximately 25% higher than the rate Lindsay chose. The rates Gross selected more accurately reflect the risks associated with the purchase of Wabash than does Lindsay's nearly risk-free rate.[31]

REA and CFC have not challenged Gross' methodology. The Court has rejected the challenges of REA and CFC to his assumptions. Gross has produced the valuations which this Court can accept. The Court now must choose which of the several scenarios would be assumed by the willing buyer, and pick the one number which is the going concern value of Wabash.

Most of the experts agreed that inflation is expected to be 4% per year for the foreseeable future. Given that inflation rate, the going concern value of Wabash is either $173,488,000; $190,220,000; $198,758,000; or $212,055,000, depending on whether CIPS or HE is expected to be the supplier for Wabash, and on whether the discount rate is 9.8% or 9.4%.

Wabash's ability to enter a contract with HE has been contested by REA. Although scheduled several times, the matter has not come before the Court for a hearing because of requests for continuances filed by various parties. However, the question to ask in choosing between these two values is not whether Wabash can enter into a contract with HE, but whether a willing buyer would anticipate that it could enter into a contract with rates and charges sim-

---

31. The rates Gross selected are below those selected by Lewellen and Kovich because of the different valuation methodologies used. Kovich and Lewellen focused on equity, and then added to that equity certain of Wabash's debts. Gross valued the entire business, and chose rates re-flective of the risk associated with debt. The risk premium for equity is higher than the risk premium for debt, and therefore the discount rates selected by Kovich and Lewellen are higher than the rates chosen by Gross.

ilar to those proposed in the HE contract. Given the overabundance of generating capacity in the Eastern grid, the Court believes that a willing buyer would assume that it could obtain a contract similar to the one proposed between Wabash and HE, and would value Wabash accordingly. This fact reduces the choice of going concern values to two: $190,220,000 if the discount rate is 9.8%, or $212,055,000 if the discount rate is 9.4%.

The appropriate discount rate is 9.4%. Selection of the lowest rate used by Gross might seem to contradict all the Court has said about the risks involved in purchasing Wabash. The Court selects 9.4% because it is the lowest rate that a willing buyer would use when valuing Wabash. The resulting going concern value is therefore liberal, and represents the *most* that this Court believes a willing buyer would offer for Wabash.

The going concern value of Wabash is $212,055,000.

### IX. *Conclusion*

Several factors limit the going concern value of Wabash. Those factors include a depressed economy in rural northern and central Indiana, the sensitivity of retail customers to rate increases, the disenchantment of several member REMCs, and fragile utility monopolies which exist primarily because of legislation. These factors create certain risks to the future stream of revenue which Wabash can generate. Confronted with those risks, a willing buyer would make certain assumptions when valuing Wabash. Most importantly, the willing buyer would assume that it could not raise rates charged the REMCs sufficiently to enable it to repay all of the Marble Hill debt.

REA and CFC attempt to minimize the risks, mostly through reams of economic data and through legal argument. REA presented as its primary witnesses two economists. Neither of the economists knows the conditions in rural northern and central Indiana, and neither attempted to discover the unique characteristics of Wabash and its REMCs. REA presented no witness with valuation experience or expertise.

By contrast, Wabash presented five witnesses with impressive credentials in the field of valuations and appraisals. Three prepared valuations. One of the experts assisted those three in determining the pertinent factors to consider in a valuation. The final expert castigated the valuation prepared for REA.

The Wabash valuations are simply more authoritative, more credible, and more reasonable than the REA valuation. From the Wabash valuations the Court has selected the one which it believes would be selected by a hypothetical willing buyer purchasing Wabash as a going concern.

The going concern value of Wabash is $212,055,000. The appropriate order shall follow.